**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No.  CR-04-1100 MV

XEVER JUAN WILLIAMS,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Xever Juan William's Motion to Suppress **[Doc. No. 21]**, filed July 28, 2004. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at the sentencing hearing that the motion was not well taken and would be **DENIED**.  The Court now sets forth the basis for its prior ruling in this Memorandum Opinion.

## <u>BACKGROUND</u>

On Thursday, May 6, 2004, at approximately 11:35 a.m., New Mexico State Police Office Arsenio Chavez was patrolling on Interstate 40 near Gallup.  He observed a 2002 Chrysler 300M sedan travel off the road onto the rumble strip and back onto the road.  The weather was clear, the ground was dry and there were no apparent obstacles to explain the car's sudden swerve.  Officer Chavez conducted a traffic stop of the car.[1]  Defendant Xever Juan Williams was driving and Robert Villegas was a passenger in the front seat.

Officer Chavez approached the car on the passenger side and explained the reason for the stop.  Williams acknowledged that he swerved over the shoulder line.  Officer Chavez requested

---

[1]  The traffic stop was recorded.  During the hearing, the Court viewed the DVD of the stop.

Williams's license, registration and insurance.  Williams gave Officer Chavez his license.  Officer Chavez testified that he noticed that Williams's hands were shaking.  Williams then reached into the glove compartment for additional information.  Officer Chavez also testified that he noticed that Williams's right leg was shaking.

Officer Chavez then asked Williams to come with him to his patrol car.  Officer Chavez questioned Williams about his destination, the length of his trip and the ownership of the car.  Williams responded that they were traveling from Long Beach, California to Dallas, Texas to visit a friend for a week and that they might see a Lakers game since the games were sold out in Los Angeles.  Williams advised that the car belonged to Villegas' brother-in-law.  When Officer Chavez asked where their friend lived, he replied that he thought in Dallas and that they planned to call when they arrived in Dallas to find him.  Officer Chavez testified that he knew that the Lakers were playing in San Antonio rather than Dallas and noticed that Defendant's leg was shaking throughout their conversation.

Officer Chavez told Williams that he was going to check the VIN number on the car and walked back to the passenger side of the car where Villegas was seated.  Officer Chavez checked the VIN number and then asked Villegas essentially the same questions he had asked Williams.  Villegas told Officer Chavez that they were going to visit a friend in Dallas for a few days.

Officer Chavez then returned to his patrol car and wrote out a citation for a violation of N.M. Stat. Ann. §66-70317, driving on roadways laned for traffic.  Officer Chavez explained Williams's options with regard to the citation and Williams stated that he would pay the fine by mail.  Officer Chavez returned Williams's documents to him and told him to have a safe day.

As Williams was walking back to his car, Officer Chavez said: "Excuse me sir, I just have a few questions real quick, is that okay?"   Williams turned and said: "Yeah, sure," and walked back toward Officer Chavez.  Officer Chavez testified that he called him back because he had become suspicious of Williams and Villegas.  Officer Chavez testified that his suspicion was based on the following:  the visible nervousness of Williams, who was shaking throughout the initial encounter; the fact that there was no registered owner in the car; the fact that Williams said that they were visiting a friend for a week while Villegas said they were visiting a friend for a few days; the fact that Williams did not know where the friend whom they were visiting lived; and the fact that the Lakers were not playing in Dallas but in San Antonio, several hundred miles south of Dallas.

Officer Chavez asked Williams further questions about his travel plans and itinerary. According to the government, Williams then stated that he was visiting a man named Juanito in Dallas and was not sure where he lived but that the last time he visited him he lived in Dallas.  Williams indicated that he planned to contact him when he arrived in Texas.  Williams said that Juanito was a friend of a cousin and that he did not know his last name.  He also said that he wanted to see a Lakers game and would see Juanito while he was out there.

Officer Chavez then asked Williams whether there was luggage in the trunk.  Williams responded that there was no luggage, only clothes.  Officer Chavez testified that he found it suspicious that Williams and Villegas had no luggage for a week-long trip.  Officer Chavez asked whether Williams had any weapons or drugs including cocaine, marijuana, methamphetamine and heroin, to which Williams responded, "No, not that I know of."  When Officer Chavez asked about methamphetamine, Williams responded, "No, I'm not a tweaker."

Next, Officer Chavez asked, "Do you mind if I look in the trunk? Can you open it up for me real quick?"   Williams said, "I don't mind opening the trunk . . ."   Officer Chavez then said to Williams, "Hang on for me right there, okay?"   Officer Chavez walked back to the car on the passenger side and questioned Villegas again about how long he had known Juanito, his travel plans and whether they had any luggage.   Villegas said that they were going to visit Juanito and that Williams knew where Juanito lived since he had been there before.   Villegas also said that there was no luggage in the car.   Officer Chavez asked about weapons and drugs, listing the same drugs as he did with Williams.   Villegas responded that they did not have any weapons or drugs.   Officer Chavez then asked, "Can you pop the trunk for me real quick? Can I take a look?"   Villegas exited the car and opened the trunk.   Officer Chavez looked in the trunk.   Officer Chavez commented that it was "a long haul for such a little bit of clothes."   Officer Chavez asked Villegas to close the trunk, which he did.   Officer Chavez told him to have safe day and started walking back to his patrol car.

As Officer Chavez was walking back to his patrol car where Williams was still standing, Williams asked Officer Chavez about whether the citation would create "points" on his California driver's license.   Officer Chavez testified that he observed that Williams's nervousness had become more profound.   Officer Chavez asked Williams, "Is everything alright, are you okay? I notice that you are a bit nervous."   Williams responded that he was nervous because he had bad experiences with the police in the past and because he was scared of weapons.   Officer Chavez again asked about Juanito and why they were taking I-40 instead of I-10 to reach Dallas.   Williams responded that Juanito lived in some little town and that Villegas knew the directions because he was driving first. He also said they were on I-40 because Dallas is in the northern part of Texas.

Officer Chavez then asked Williams, "Can I search the vehicle? Is that fine, okay with you?" Williams said, "Okay." Officer Chavez called for back-up and retrieved a consent to search form. Officer Chavez asked Williams if he could read English and told him to make sure he read and understood the form before signing it. After Williams signed the form, Officer Chavez asked him to hang out on the side of the road by the bushes.

Officer Chavez then walked back over to the car where Villegas was still sitting in the passenger seat. Officer Chavez asked Villegas if he could search the car and said that he had his dog with him and that he would "make it real quick, is that okay?" He asked Villegas if he could read English and asked him to "hang out right there for me." He told Villegas to read the form and make sure he understood it before signing it. Villegas signed the form. Officer Chavez asked Villegas to step out of the car, patted him down and asked him if he could move the vehicle a little bit.

Officer Chavez moved the car further off the road. He then retrieved his dog Chica from his patrol car and brought her over to the car. She alerted to the vehicle. Subsequently, Officer Chavez found a hidden compartment within the cowling of the car containing a vacuum sealed package which Officer Chavez believed to contain a controlled substance. The car was towed to the police office where eight packages of methamphetamine were removed from the cowling.

On July 28, 2004, Defendant filed the instant motion to suppress the evidence seized as a result of his detention by Officer Chavez. The government filed a response in opposition on August 3, 2004 and a supplemental response on August 20, 2004. On September 30, 2004, the Court held an evidentiary hearing. At the conclusion of the hearing, for the reasons set forth herein, the Court denied Defendant's motion.

## DISCUSSION

Defendant argues that the evidence seized as a result of the traffic stop should be suppressed on the basis that his continued detention was invalid.   Specifically, Defendant challenges the reasonableness of the detention after Officer Chavez issued him the citation, returned his documents and sent him on his way.   According to Defendant, Officer Chavez's further questioning exceeded the permissible scope of the detention.   The government opposes Defendant's motion and, as a preliminary matter, argues that Defendant does not have standing to challenge the search of the car.

**I.**      **Standing**

The government asserts that Defendant has no standing to challenge the search of the car. The issue of standing "'is invariably intertwined' with substantive fourth amendment analysis." *United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991) (citing *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)).   Accordingly, the Court must determine "'whether the challenged search or seizure violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence.'"  *Arango*, 912 F.2d at 445 (citing *Rakas*, 493 U.S. at 140).   To determine whether a search has violated the rights of the defendant, the Court must consider whether the defendant " manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable." *Arango*, 912 F.2d at 445.

Defendant bears the burden of showing standing to challenge a search and seizure.  *See United States v. Martinez*, 983 F.2d 968, 972 (10th Cir. 1992), *cert. denied*, 508 U.S. 922 (1993). While "the proponent of a motion to suppress need not always come forward with legal documentation establishing that he lawfully possessed the area searched, the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession."

*Arango*, 912 F.2d at 445.  In *Arango*, the Tenth Circuit held that where a non-owner driver of a vehicle failed to present evidence that he lawfully possessed a vehicle stopped for speeding, the driver had no reasonable expectation of privacy in the vehicle.  Similarly, in *United States v. Eylicio-Montoya*, 70 F.3d 1158 (10th Cir. 1995), the Tenth Circuit held that the defendant, who was a passenger in the car that was searched, did not have standing to challenge the search of the car.  The Tenth Circuit explained:  "neither the fact that [the driver] borrowed the [car] from the owner nor the fact that the owner permitted [the defendant] to ride in the car establishes that [the defendant] had a legitimate expectation of privacy in it."  *Id.* at 1162.

In the instant case, Williams was driving and Villegas was the passenger.  Neither owned the car.  Rather, Williams stated that the car belonged to Villegas' brother-in-law.  At the hearing, the government produced evidence that the car was registered to someone named Carillo Gabriel.  Defendant produced no evidence that he had a reasonable expectation of privacy in the car.  Thus, the Court agrees that Defendant does not have standing to challenge the search of the car.

Nonetheless, Defendant may challenge the lawfulness of his own seizure.  The Tenth Circuit "'has repeatedly recognized that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention.'"  *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (citation omitted).  If the detention of the defendant is unlawful, "the 'fruit of the poisonous tree' doctrine might dictate exclusion of the evidence discovered during the search."  *United States v. Erwin*, 875 F.2d 268, 272 (10th Cir. 1989).

In order to suppress evidence as the fruit of an unlawful detention, a defendant must establish that (1) "the detention did violate his Fourth Amendment rights"; and (2) there is "a factual nexus between the illegality and the challenged evidence." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000).  If the defendant succeeds in establishing both an illegal detention and a factual nexus between the illegal detention and the discovery of the evidence, the burden shifts to the government to "prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  *Id.* (citations omitted).

To establish a factual nexus, "'[a]t a minimum, [the defendant] must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'"  *DeLuca*, 269 F.3d at 1132 (citation omitted).  For example, if the passenger in a car that is searched challenges the evidence discovered in the search, he or she must show that, but for his or her continued presence due to an illegal detention, the officer would not have found the evidence that ultimately was discovered in the car.  *See id*. at 1133.

In the instant case, Defendant does not base his motion on the illegality of the search itself.  Rather, he contends that his continued detention by Officer Chavez constituted an illegal seizure under the Fourth Amendment and that the methamphetamine discovered in the car during the detention thus should be excluded.  In order to have standing to make this argument, Defendant would have to establish that his continued detention was illegal *and* that the methamphetamine discovered in the car would not have been discovered but for his illegal detention.  If Defendant met this burden, the government would have to establish that, regardless of whether Defendant had been

-8-

illegally detained, the methamphetamine would have been inevitably discovered, would have been

discovered through independent means or was so attenuated from the illegality as to dissipate the taint

of the illegal conduct.   As set forth below, the Court does not find that Defendant's continued

detention was illegal.   Accordingly, the Court need not reach the issue of whether the parties have

met their respective burdens as to standing.

**II.**     **Initial Stop and Further Detention**

The Tenth Circuit explicitly has stated that "[s]topping an automobile and detaining its

occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the

purpose of the stop is limited and the detention is brief." *United States v. Zubia-Melendez*, 263 F.3d

1155, 1160 (10th Cir. 2001).   Accordingly, a routine traffic stop is "'subject to the constitutional

imperative that it not be "unreasonable" under the circumstances.'"   *Id.* (citations omitted).   The

reasonableness of a traffic stop, which "is an investigative detention analogous to a *Terry*

stop[,] . . . is evaluated in two respects: first, whether the officer's action was justified at its inception,

and second, whether the action was reasonably related in scope to the circumstances that first justified

the interference."   *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *cert.*

*denied*, 511 U.S. 1095 (1994).

**A.**     **Justification at Inception of Stop**

Under the first prong of this test, a traffic stop is justified at its inception so long as:

the stop is based on an observed traffic violation or if the police officer has reasonable
articulable suspicion that a traffic or equipment violation has occurred or is occurring.
It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in
question is sufficiently ordinary or routine according to the general practice of the
police department or the particular officer making the stop."   It is also irrelevant that
the officer may have had other subjective motives for stopping the vehicle.   Our sole
inquiry is whether this particular officer had reasonable suspicion that this particular

motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (citations omitted), *cert. denied*, 518 U.S. 1007 (1996).

In the instant case, the traffic stop was justified at its inception. Specifically, the stop was based on Officer Chavez's reasonable articulable suspicion that Williams was in violation of N.M. Stat. Ann. §66-7-317. Officer Chavez observed Williams' car cross the rumble strip, go off of the highway and return back onto the highway. Based on his observation, Officer Chavez had a reasonable articulable suspicion that a traffic regulation was being violated.

**B.   Reasonably Related in Scope to the Circumstances of Stop**

Under the second prong of this test, an "officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Arango*, 912 F.2d at 446. In addition, "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop.'" *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citation omitted). Once "the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *Arango*, 912 F.3d at 446. Additional questioning is permissible, however, if: "(1) 'during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity'; or (2) 'the driver voluntarily consents to the officer's additional questioning.'" *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (citation omitted)**.**

As set forth below, the Court finds that, after Officer Chavez issued the citation to Defendant, Defendant voluntarily consented to additional questioning.  Moreover, the Court finds that it was during this consensual encounter that Defendant validly consented to the search of the car.  For this reason, the Court need not address whether Officer Chavez developed reasonable suspicion to continue questioning Defendant.

### 1.   <u>Consensual Encounter</u>

"In determining whether a police-citizen encounter is consensual, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).  Each case "turns on the totality of the circumstances presented."  *Id.* (citations omitted).  In the context of a traffic stop, a detention becomes a consensual encounter only "if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."  *West*, 219 F.3d at 1176.  The return of a driver's documents alone does not end a detention if there is "evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'"  *Elliot*, 107 F.3d at 814 (citation omitted).  Similarly, an encounter after the return of documentation is "consensual only if 'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" *Id.* (citation omitted).

### 2.   <u>Consent to Search Given During Consensual Encounter</u>

Whether a defendant's consent to search during a consensual encounter is valid is a question of fact to be determined from the totality of the circumstances.  *See United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000).  The government bears the burden of proving valid consent.  *See United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir.), *cert. denied*, 525 U.S. 903 (1998).  To establish that the defendant's consent was valid, the government "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given'" and "must show that the police did not coerce the defendant into granting his consent." *Id.* (citation omitted); *see also United States v. Flores*, 48 F.3d 467, 468 (10th Cir.) (government must prove that defendant's consent was voluntary and was not given under duress or coercion), *cert. denied*, 516 U.S. 839 (1995).

With regard to whether consent is voluntarily given, "the dispositive issue is whether a reasonable law enforcement officer would have understood defendant's actions to indicate her voluntary consent to the search." *Flores*, 48 F.3d at 469.  With regard to whether consent is free from coercion, the court is directed to consider: "'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.'" *Pena*, 143 F.3d at 1367 (citation omitted).  An officer's failure to inform the defendant that he can refuse or withdraw consent or that he can leave the scene is also relevant.  *See id.*  Finally, "[a]n officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'"  *Id.* (citation omitted).

### 3.    The Instant Case

Taking into account all of the circumstances, the Court finds that the encounter between Defendant and Officer Chavez became consensual once Officer Chavez returned Defendant's

documents to him and told him to have a safe day.  After allowing Defendant to walk back to his car,

Officer Chavez asked Defendant whether it would be okay to ask him a few more questions.

Defendant responded in the affirmative and walked back over to where Officer Chavez was standing.

Officer Chavez did not constrain Defendant with an overbearing show of authority.  He did not

threaten Defendant in any way or draw his weapon but rather exercised courtesy and professionalism

throughout his additional discussion with Defendant.   Accordingly, once Officer Chavez told

Defendant to have a safe day, a reasonable person under the circumstances would have believed that

he was free to leave or disregard Officer Chavez's request to continue to ask questions.

Moreover, the totality of the circumstances shows that Defendant's consent to the search of

the car was unequivocal, specific and freely and intelligently given.  Officer Chavez asked Defendant

whether it would be fine with him if he searched the vehicle.  Defendant responded in the affirmative.

Defendant also signed a consent to search form.  Before he signed the form, Officer Chavez asked

whether Defendant read English and instructed Defendant to make sure he read and understood the

form before signing it.  In requesting consent to search, Officer Chavez did not coerce, threaten or

promise anything in return for Defendant's consent. The consent form that Defendant signed

specifically stated:

> I understand that I have the right to refuse the consent to the search described above
> and to refuse to sign this form.  I further state that no promises, threats, force,
> physical or mental coercion of any kind whatsoever have been used against me to get
> me to consent to the search.

Based on the circumstances surrounding Defendant's consent to search in addition to the language

of the consent form that Defendant signed, the Court is convinced that a reasonable law enforcement

officer would have understood Defendant's actions to indicate his voluntary consent to the search.

## CONCLUSION

Officer Chavez's stop of Defendant was justified at its inception.   The stop became a consensual encounter once Officer Chavez returned Defendant's documents to him and told him to have a safe day.  During the consensual encounter, Defendant voluntarily consented to the search of his car.  Accordingly, the evidence seized as a result of the search was not the fruit of an illegal detention and need not be suppressed.

**IT IS THEREFORE ORDERED** that Defendant Xever Juan Williams's Motion to Suppress **[Doc. No. 21]** is hereby **DENIED**.

Dated this 29th day of December, 2004.


_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Reeve Swainston

<u>Attorneys for Defendant</u>:
Sigmund Bloom
D. Eric Hannum

-14-